594 So.2d 410 (1991)
MENZIE TILE COMPANY, INC.
v.
PROFESSIONAL CENTRE, a Louisiana General Partnership, et al.
BERNHARD MECHANICAL CONTRACTORS
v.
PROFESSIONAL CENTRE, a Louisiana General Partnership, et al.
MONTGOMERY ELEVATOR COMPANY
v.
PROFESSIONAL CENTRE, a Louisiana General Partnership, et al.
CRASTO ARCHITECTURAL PRODUCTS, INC., and/or Southern Architectural Products, Inc.
v.
PROFESSIONAL CENTRE, a Louisiana General Partnership, et al.
DOYLE ELECTRIC, INC.
v.
PROFESSIONAL CENTRE, a Louisiana General Partnership, et al.
NORTH AMERICAN CONTRACTORS
v.
PROFESSIONAL CENTRE, a Louisiana General Partnership, et al.
MID SOUTH FIRE PROTECTION, INC.
v.
PROFESSIONAL CENTRE, a Louisiana General Partnership, et al.
HARRY S. PETERSON COMPANY, INC.
v.
PROFESSIONAL CENTRE, a Louisiana General Partnership, et al.
ALL AMERICAN DECORATING SERVICE, INC.
v.
PROFESSIONAL CENTRE, a Louisiana General Partnership, et al.
HECK INDUSTRIES, INC.
v.
PROFESSIONAL CENTRE, a Louisiana General Partnership, et al.
Nos. 90 CA 1931-90 CA 1940.
Court of Appeal of Louisiana, First Circuit.
December 27, 1991.
Rehearing Denied March 13, 1992.
*412 Craig L. Kaster, Murphy Foster, III, Baton Rouge, and Jeff Snodfrass, New Orleans, for plaintiffs-appellees.
Jeff Whittenbrink, Kathryn Wyble, and James Holliday, Jr., Baton Rouge, for defendants-appellants.
Before SHORTESS, LANIER and CRAIN, JJ.
SHORTESS, Judge.
This litigation involves ten consolidated suits brought by contractors, subcontractors, and suppliers (plaintiffs)[1] against Centerbank (formerly Bank Center) (defendant), who was one of the lenders for the Professional Centre office building project on Essen Lane, in Baton Rouge, Louisiana. The suits were based primarily on detrimental reliance.[2] After a trial on the merits, a unanimous jury reached a verdict in favor of plaintiffs. From a separate judgment which totals $975,584.44, plus legal interest, defendant appeals.[3]

FACTS
A number of entities are involved in this suit, and they need some form of introduction. The Professional Centre Partnership (the partnership), composed of John Clements and Dr. Henry Olinde, undertook in 1984 to construct the Professional Centre office building. Savings Investments Service Corporation (SIScorp) supplied the partnership construction financing in the amount of 17 million dollars. SIScorp sold participation in the construction loan to various lenders, including defendant. The partnership hired Hambrick-Craig as the general contractor. Hambrick-Craig in turn subcontracted with the majority of the plaintiffs.
*413 SIScorp defaulted on its loan obligation in late 1985, and defendant assumed the position of lead lender. Defendant hired Strategic Services, an accounting firm based in Utah, to keep the books on the project. Defendant also hired Ch2M Hill, an architect/engineering firm based in Mississippi, to assist Strategic Services in handling the submitted draws for work completed. Specifically, Ch2m Hill was to provide on-site inspections and report to Strategic Services whether the amount of funds requested corresponded to the amount of work performed, and to estimate the cost of completion.
In February 1986 Hambrick-Craig left the job without paying the subcontractors any of the $350,000.00 monthly draw it had just received.[4] The partnership eventually hired North American Constructors to replace Hambrick-Craig as the general contractor.
Before defaulting on its loan obligation, SIScorp had fallen behind on funding the draws for work completed on the project. This created apprehension in the minds of the subcontractors. Their apprehension significantly increased when Hambrick-Craig left the job with a significant amount of money that belonged to the subcontractors. In an effort to assuage the subcontractors' concerns and convince them to stay and complete the project, Charles Dennison, the partnership's project supervisor, met with the subcontractors on February 27, 1986. The subcontractors expressed concern over receiving payment for labor and materials already in the project, as well as whether sufficient funds existed to complete the project. They demanded that the lender or its representative provide written assurances and meet with them to provide some form of verbal assurances. If they did not receive the assurances, they threatened to walk off the job, which at that time was approximately 90% complete.
Dennison testified[5] that after the February 27 meeting, he had Bill Gaines, the certified public accountant for the partnership, contact David Rogers of Strategic Services and request something in writing which stated that enough money was left in the loan to complete the project.
Clements testified that, meanwhile, he traveled to Connecticut in early March and met with Dave Watson, defendant's loan officer in charge of the project. Clements also testified he informed Watson verbally (and in writing) that assurances were needed to keep the subcontractors on the job, and that Watson agreed to provide said assurances. On the other hand, Watson testified he did not recall the conversation with Clements or receiving Clements' letter.
Rogers testified Gaines did not inform him the subcontractors wanted the letter. He admitted however that Gaines informed him the subcontractors wanted a representative of the lender at a meeting scheduled for March 7, 1986. Rogers contacted Watson and received approval to write a letter to Gaines that contained the requested information. On March 6, 1986, Rogers sent the following letter, apparently by overnight mail, which was addressed to Gaines:
Dear Mr. Gaines:
I have examined the construction budget for the Professional Centre office along with related loan documents. As of this date, there is sufficient money left in the loan to complete the basic structure based upon the current estimated costs.
This letter was given to the subcontractors at a meeting held the following day, March 7, 1986.
Watson testified he did not recall authorizing Rogers to send the letter. However, Watson admitted receiving a copy of Rogers' letter "within a few days afterward."
Dennison testified he contacted Rob Wamstad, of Ch2M Hill, who agreed to attend the March 7 meeting with the subcontractors. Dennison also testified he and Wamstad agreed that Wamstad would come to Baton Rouge, review the draw schedule, examine the physical structure, and then meet with the subcontractors and give a report as to his findings.
*414 Wamstad attended the meeting with the contractors on March 7, 1986. Wamstad testified he received approval to come to Baton Rouge. He stated "the Bank ... felt that it was of value to see what discussions were going on at the site." Wamstad did not remember much of what was said or done at the meeting. However, he did remember the letter being passed out and Dennison stating there was enough money in the loan to finish the project. He also admitted not refuting what was contained in the letter. Moreover, he denied being asked about the sufficiency of the funds to complete the project.
Several of the people who attended the March 7 meeting testified at trial. Gaines, Dennison, Eugene Dunavant, of Mid South Fire Protection Inc., Robert A. Schenk, president of All American Decorating Inc., and Edward M. Boyle, a representative of Crasto Architectural Products Inc., all testified that Wamstad assured plaintiffs there was enough money in the loan to complete the project and they would receive a check for all arrearages within two to three weeks. Robert T. Leitner, president of Doyle Electric, testified at a minimum Wamstad agreed with Dennison that enough money was left in the loan to finish the project.[6]
The subcontractors remained on the job, which at the time of the March 7 meeting was approximately 90% complete. As assured by Wamstad, the lenders issued a check for the arrearages shortly after the meeting. The project eventually failed, and the lenders foreclosed on the property. Plaintiffs did not receive their final payments.
As noted above, defendant appeals from a judgment in favor of plaintiffs. Defendant asserts 14 assignments of error:
ERROR NO. 1:
The trial court erred in instructing the jury that if certain parties were a representative or agent of Centerbank for any purpose, then Centerbank was bound by any and all acts of that representative or agent.
ERROR NO. 2:
The trial court erred in instructing the jury that if Centerbank benefited, incidentally or otherwise, from representations made by alleged agents of Centerbank, then Centerbank was liable to the plaintiffs.
ERROR NO. 3:
The trial court erred in refusing to give Centerbank's requested jury instruction regarding the duty of inquiry into the authority of an alleged agent, within the context of the doctrine of apparent authority.
ERROR NO. 4:
Centerbank's most critical witness was to be Craig Kaster. The trial court erred in granting, without a hearing or argument of any kind, the Motion In Limine to exclude Mr. Kaster's testimony.
ERROR NO. 5:
The trial court erred in refusing to instruct the jury, despite Centerbank's request, that the knowledge of an attorney is imputable to his client, and that the attorney's failure or refusal to tell the client of knowledge, the possession of which by the client would defeat the client's claim, does not shield the client from such imputation.
ERROR NO. 6:
The trial court erred in refusing to instruct the jury, despite Centerbank's request, that damages recoverable under a detrimental reliance claim may be limited to expenses and losses actually incurred, rather than such expenses and losses plus lost profits.
ERROR NO. 7:
The trial court erred in refusing to instruct the jury, despite Centerbank's request, that principles of comparative fault were applicable to this tort action.
ERROR NO. 8:
The trial court erred in dismissing Centerbank's claim for "set off" against Crasto Architectural Products, Inc., for defective products, on the basis of a provision which was not applicable due to *415 Crasto's admitted knowledge of said defects.
ERROR NO. 9:
The jury was manifestly erroneous in determining that the plaintiffs did not have convenient means of acquiring knowledge of facts which would have made their reliance unreasonable.
ERROR NO. 10:
The jury was manifestly erroneous in determining that losses incurred by the plaintiffs prior to the date alleged representations were made proximately caused by the plaintiffs' reliance on those representations.
ERROR NO. 11:
The jury was manifestly erroneous in determining that any representations upon which North American Constructors, Inc. could have relied to its detriment were ever made to North American by Centerbank or its representatives.
ERROR NO. 12:
The trial court erred in ordering Centerbank to pay the expenses for one of the plaintiff's attorneys to go to Waterbury, Connecticut, to conduct plaintiffs' discovery.
ERROR NO. 13:
The jury was manifestly erroneous in determining that the plaintiffs' damages were caused by their alleged reliance.
ERROR NO. 14:
The jury was manifestly erroneous in determining that the plaintiffs' alleged reliance was "reasonable" or "justifiable."

ASSIGNMENTS OF ERRORS NOS. 1, 2, 3, 4, 5, 6, & 7
Defendant contends the trial court improperly instructed the jury in several different ways. In order for this court to consider whether a trial court properly instructed the jury regarding appropriate legal standards, an objection must be made on the record by the appellant which states specifically the matter to which he objects and the grounds of his objection. La. C.C.P. art. 1793(C); Petitto v. McMichael, 588 So.2d 1144, 1146 (La.App. 1st Cir.1991); and Dawson v. Mazda Motors of America, Inc., 517 So.2d 283 (La.App. 1st Cir.1987). The defendant failed to make sure its objection (if made) was properly preserved in the record; therefore, we pretermit answering the legal issues presented by these assignments of error.

Assignment of Error No. 4
Defendant contends the trial court erred in granting, without a hearing or argument of any kind, a Motion in Limine to exclude at trial the testimony of Craig Kaster, attorney for eight of the plaintiffs.[7] Although defendant complains on appeal that Kaster should have been required to testify at trial, defendant did not call Kaster to the stand and proffer his testimony. Error may not be predicated upon a ruling which excludes evidence unless a substantial right of a party is affected and the substance of the evidence was made known to the court by counsel. La. Code Evid. art. 103(A)(2); La.Code Civil Proc. art. 1636; McLean v. Hunter, 495 So.2d 1298 (La.1986); Engineered Mechanical Services v. Langlois, 464 So.2d 329 (La.App. 1st Cir.1984), writ denied, 467 So.2d 531 (La.1985).

Assignment of Error No. 8
Defendant contends the trial court erred in granting a directed verdict dismissing its claim for "set off" against Crasto for installing defective glass panels. The exterior of the building, the skylights, and a glass handrail around the atrium area are comprised of numerous large tempered glass panels. The architects who designed the building specified the use of the panels, which were manufactured by Pittsburgh Plate Glass, Inc., and tempered by Applied Coatings Technology, Inc. Crasto was hired to install the panels. There is no evidence in the record showing that Crasto failed to comply with the specifications of the contract, that Crasto installed the panels in a negligent manner, or that Crasto was aware of a problem with the glass at the time of installation. The trial court *416 held that Crasto could avail itself of the immunity provided under LSA-R.S. 9:2771:
No contractor shall be liable for destruction or deterioration of or defects in any work constructed, or under construction, by him if he constructed, or is constructing, the work according to plans or specifications furnished to him which he did not make or cause to be made and if the destruction, deterioration or defect was due to any fault or insufficiency of the plans or specifications. This provision shall apply regardless of whether the destruction, deterioration or defect occurs or becomes evidence prior to or after delivery of the work to the owner or prior to or after acceptance of the work by the owner. The provisions of this Section shall not be subject to waiver by the contractor.
See also City of Covington v. Heard, 428 So.2d 1132 (La.App. 1st Cir.1983); LeBreton v. Brown, 260 So.2d 767 (La.App. 4th Cir.1972), aff'd, 277 So.2d 645 (La.1973); and Sisters of the Good Shepherd v. Quinn Construction Co., 225 So.2d 225 (La.App. 4th Cir.), writ denied, 254 La. 844, 227 So.2d 591 (La.1969).
Based on the record before us, we cannot find the trial court erred in finding reasonable people could not have reached a verdict in favor of the defendants against Crasto. Villaronga v. Gelpi Partnership Number 3, 536 So.2d 1307, 1309 (La.App. 5th Cir.1988), writs denied, 540 So.2d 327, 329 (La.1989).

Assignment of Error No. 9
Defendant contends the trial court was manifestly erroneous in finding the plaintiffs did not have convenient means of acquiring knowledge of facts which would have made their reliance unreasonable. As pointed out by plaintiffs in their briefs, they received assurances from Rogers, of Strategic Services, who was hired to keep the books of the project. We cannot conclude the trial court was clearly wrong in finding plaintiffs were reasonable in relying on a statement made by the accounting firm for the project. If the court's findings are reasonable in light of the record reviewed in its entirety, a court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).

Assignment of Error No. 10
Defendant contends the jury erroneously awarded plaintiffs monies for work performed prior to the statements made by Rogers and Wamstad. The parties stipulated to the amount of damages sustained by plaintiffs. A special jury verdict form was submitted to the jury which provides in pertinent part:
Do you find by a preponderance of the evidence that the plaintiffs (subcontractors/suppliers) are entitled to recover all sums stipulated by Centerbank (formerly the Banking Center) to have been expended on labor and materials on the construc[ti]on of the Professional Centre Project?
The record does not reveal that defendant objected to the proposed jury verdict form. If an objection to the proposed jury verdict form is not made on the record, the objection is waived. La.C.C.P. arts. 1812-1813. Wiggins v. Exxon Corp., 590 So.2d 1209, 1210 (La.App. 1st Cir.1991).

Assignment of Error No. 11
North American Constructors, Inc., did not attend the March 7 meeting, and the partnership did not hire North American Constructors, Inc., to replace Hambrick-Craig until well after the meeting. Defendant contends it should not be held liable to the entire world for reliance on any representations made by it. In essence, defendant contends any damage suffered by North American was not caused by Rogers' letter or Wamstad's statements to the subcontractors.
Richard Walsh, a partner of North American, testified at trial. According to Walsh, Gaines furnished North American a copy of Roger's letter, and that afterwards he spoke with other subcontractors concerning what occurred at the meeting. Walsh also stated North American waited until after *417 the subcontractors received their arrearages, as promised during the March 7 meeting, before committing to the project.
Wamstad drafted a report of the March 7 meeting and sent it to Rogers. The report establishes that Wamstad knew North American was the most likely candidate to replace Hambrick-Craig as general contractor. The record also indicates the success of the project depended on someone like North American agreeing to replace Hambrick-Craig as general contractor. Rogers testified he forwarded Wamstad's report to Watson.
The trial court apparently found it was foreseeable and likely that North American would rely on the representations made by defendant. Based on the record before us, we cannot conclude the trial court was clearly wrong in finding in favor of North American. Rosell, 549 So.2d at 844.

Assignment of Error No. 12
Defendant assigns as error the trial court's ruling on a pretrial discovery matter. Crasto filed a request for production of documents to defendant. Defendant objected to one of the requests on the basis of relevancy. Crasto then moved to compel defendant to respond. After a hearing, the trial court granted the motion to compel. The court ordered that the documents be produced at defendant's offices in Waterbury, Connecticut. The court also ordered defendant to pay Crasto's counsel's expenses to travel to Connecticut, limited to one round trip coach airfare and $250.00 per diem.
Defendant correctly contends the trial court erred in ordering it to pay travel expenses. Louisiana Code of Civil Procedure article 1469(4) provides that if a motion to compel is granted, the court shall award to the prevailing party "the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust." In MTU of North America, Inc. v. Raven Marine, Inc., 475 So.2d 1063, 1070 (La.1985), the trial court awarded travel expenses on a motion to compel. The Louisiana Supreme Court distinguished the expenses which a trial court is authorized to award under article 1469 from the "panoply of sanctions" which may be imposed under Code of Civil Procedure article 1471 if a party fails to provide or permit court-ordered discovery and held the sanctions imposed exceeded those authorized by law. On remand, this court set aside the award of travel expenses. MTU of North America, Inc. v. Raven Marine, Inc., 499 So.2d 289 (La.App. 1st Cir.1986). See also Shaw v. Champlin Petroleum Co., 501 So.2d 1054, 1058 (La.App. 2d Cir.), writ denied, 504 So.2d 876 (La.1987).
The trial court exceeded its authority in ordering defendant to pay Crasto's counsel's travel expenses in connection with the discovery in Connecticut. We thus reverse the portion of the interlocutory decree of February 15, 1990, ordering defendant to pay one round trip coach airfare and $250.00 per diem to Crasto.

Assignment of Error No. 13
As noted above, the lenders agreed to finance 17 million dollars for what was supposed to be a 20.8-million-dollar project. The fact that the lenders funded the 17 million dollars is uncontested. Defendant contends that if the partnership had not defaulted on its obligation to provide 3.8 million dollars to the project, plaintiffs' reliance would have produced no detriment.
According to the testimony of Clements, SIScorp committed to provide the construction loan and permanent financing for the project. The partnership intended to divide the office project into individual office condominiums that were to be sold primarily to physicians. The 3.8 million dollars of owners "equity" in the project (of which approximately 3 million dollars was to go for completing the tenants' individual condominiums after the basic shell was completed) was to come from the sale of the condominiums. In the event the partnership could not sell a sufficient number of the condominiums, the partnership was to *418 lease out the offices, and SIScorp was to fund the needed permanent financing.
Defendant contends Rogers' letter was based on the presumption that the partnership would contribute 3.8 million dollars to the project. However, the record reveals that at the time Rogers drafted the letter, the lender was aware no "equity" was yet funded by the partnership. Moreover, Rogers admitted that when he received Wamstad's report of the meeting, he understood that the letter may have been misunderstood, yet he made no effort to correct the misunderstanding.
As pointed out by plaintiff in brief, the letter clearly states there is sufficient money left in the loan to complete the basic structure. Nothing stated therein is contingent on the partnership funding the project in any way.
Based on the record before us, we cannot conclude the trial court was clearly wrong in this finding. Rosell, 549 So.2d at 844.

Assignment of Error No. 14
Defendant contends plaintiffs' reliance on the alleged representations is unreasonable; plaintiffs should have pursued getting assurance in writing from the lenders.
The jury obviously found plaintiffs received assurances from Rogers and Wamstad. Rogers and Wamstad were in the best position to know whether funds existed to complete the project. Plaintiffs were dealing with reputable firms. Additionally, plaintiffs received, as promised, all of the arrearages shortly after the March 7 meeting. Plaintiffs have not contended they were seeking to bind the lender as a surety. Plaintiffs' position at trial indicates they did not believe the partnership's uncorroborated statements that sufficient money existed in the loan for them to be paid. Plaintiffs sought to verify what the partnership was telling them from independent sources. Based on the record before us, we cannot conclude the trial court was clearly wrong in this finding. Rosell, 549 So.2d at 844.

Conclusion
For the reasons above, we reverse the interlocutory judgment of February 15, 1990. The trial court's judgment of May 29, 1990, on the merits is affirmed. All costs of this appeal are assessed to appellant, Centerbank.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.
NOTES
[1] The plaintiffs are Menzie Tile Company, Inc., Bernard Mechanical Contractors, Montgomery Elevator Company, Crasto Architectural Products, Inc., and/or Southern Architectural Products, Inc., Doyle Electric, Inc., North American Contractors, Mid South Fire Protection, Inc., Harry S. Peterson Company, Inc., All American Decorating Service, Inc., and Heck Industries, Inc.
[2] A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable. La.C.C. art. 1967. For two excellent discussions of the subject matter, see Litvinoff, Still Another Look at Cause, 48 La.L.R. 3 (1987); and Comment, Louisiana's Tenfold Approach to the Duty to Inform, 66 Tu.L.R. 151 (1991).
[3] Crasto also obtained a judgment against Professional Centre and Henry D.H. Olinde. A reconventional demand filed by Olinde was dismissed. Neither Professional Centre nor Olinde has appealed, and those judgments are final.
[4] Apparently, Hambrick-Craig has subsequently filed bankruptcy.
[5] Dennison's deposition was admitted in lieu of his live testimony.
[6] The parties stipulated that if the remainder of the plaintiffs had testified their testimony would be substantially the same as the testimony of those at trial.
[7] We note that Kaster responded to written interrogatories.